UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| THE MCDONNEL GROUP, LLC | CIVIL ACTION NO: 18-1380 c/w 19-2230; 19-10462 |
| VERSUS | (Applies to All Cases) |
| STARR SURPLUS LINES INSURANCE COMPANY AND LEXINGTON INSURANCE COMPANY | SECTION: T (1) |

## ORDER AND REASONS

This matter is before the Court on cross-motions for partial summary judgment concerning the proper calculation of the flood deductible under the applicable insurance policies (the "Policy") for damages that occurred during a flood event on August 5, 2017 (the "Flood Event"), at the renovation site of the Jung Hotel and Residences in New Orleans (the "Project").[1] The issues presented by these motions were before the Court previously on similar cross-motions.[2] Namely, Plaintiffs, the McDonnel Group, LLC ("McDonnel") and All Star Electric, Inc. ("All Star"), and intervenor, the Jung, LLC ("Jung") (collectively, "Plaintiffs"), argue the Policy's flood deductible is $500,000. Conversely, Defendants, Starr Surplus Lines Insurance Company ("Starr") and Lexington Insurance Company ("Lexington") (collectively "Defendants"), assert the Policy's flood deductible is $3,443,475, or 5% of the Project's value at the time of the Flood Event.[3] The Court previously granted summary judgment in favor of Defendants, finding the Policy unambiguous and holding the flood deductible to be properly calculated as $3,443,475.[4] That

---

[1] R. Doc. 768, The Jung, LLC's Motion for Partial Summary Judgment as to Calculation of Deductible for Damages Caused by Flood; R. Doc. 828, Defendants' Motion for Partial Summary Judgment Regarding the Flood Deductible; *see also* Oppositions and Reply Briefs, R. Docs. 870, 873, & 895.
[2] *See* R. Docs. 305, 309, 329, & 337.
[3] The parties agree the Project was approximately 80% complete at the time of the Flood Event. Thus, the calculated total insured values at risk at the time and place of loss was $68,869,506 (80% multiplied by $86,086,883, the total insured value of the completed Project).
[4] R. Docs. 661 & 688.

1

ruling was appealed to the United States Court of Appeals for the Fifth Circuit. The Fifth Circuit held that the Policy's flood deductible provision was ambiguous, vacated the Court's ruling, and remanded this matter for consideration of whether extrinsic evidence resolves the Policy's ambiguity.[5] Secondarily, the appellate court instructed this Court to "determine whether the [Louisiana law] presumption in favor of coverage in the case of an ambiguity applies here."[6] Following remand, the Court requested supplemental briefing from the parties on these issues.[7] Having reviewed the parties' motions, supplemental briefing, and considering the facts and applicable law, the Court GRANTS Defendants' Motion for Partial Summary Judgment and DENIES Plaintiffs' Motion for Partial Summary Judgment.

I.  BACKGROUND

This lawsuit arises out of several loss events that occurred at the Project during 2017. In 2014, Jung hired McDonnel to be the Project's general contractor. In early 2015, McDonnel purchased the Policy from Defendants to cover the Project. Under the Policy, Starr and Lexington each insured 50% of the risks for the Project. The Policy had an effective policy period of February 23, 2015, through February 23, 2017, and listed a Total Insured Value of $76,086,833. The policy period was subsequently extended through multiple endorsements to August 22, 2017, with a revised Total Insured Value of $86,086,833. The instant motions concern only the calculation of the applicable deductible for the losses sustained on August 5, 2017, during the Flood Event.

---

[5] *McDonnel Group, LLC v. Starr Surplus Lines Insurance Company*, 15 F.4th 343, 351 (5th Cir. 2021).
[6] *Id.*
[7] R. Doc. 727; *see also* R. Doc. 728, Defendant's Supplemental Brief in Support of Cross-Motion for Partial Summary Judgment; R. Doc. 735, The McDonnel Group, LLC's Supplemental Brief Submitted Pursuant to the Court's December 20, 2021 Order (Doc. 727); R. Doc. 736, All Star Electric, Inc.'s Supplemental Memorandum in Support of Motion for Partial Summary Judgment and In Opposition to Defendants' Cross-Motion for Partial Summary Judgment Pursuant to the Court's December 20, 2021 Order (Doc. 727); R. Doc. 737, The Jung, LLC's Supplemental Memorandum in Support of Motion for Partial Summary Judgment as to Calculation of Deductible for Damages Caused by Flood; R. Doc. 740, Defendants' Combined Reply Brief in Support of Their Supplemental Brief to Cross-Motion for Partial Summary Judgment.

On that day, heavy rain caused the Project site to flood, resulting in extensive physical damage. On August 7, 2017, McDonnel provided a Notice of Loss to Defendants, claiming $3,226,164.30 in damages for the Flood Event. Defendants calculated the flood deductible to be approximately $3,443,475, and therefore determined McDonnel's claimed damages fell below the applicable flood deductible. McDonnel, All Star, and Jung, however, assert the Policy's flood deductible is $500,000 and after application of that deductible they are entitled to $2,726,164.30 for the Flood Event damages.

The Policy contains the following pertinent provisions:

**9. LIMIT OF LIABILITY**

***

**C. Term Aggregate Limits of Liability:**

Notwithstanding the foregoing and irrespective of the above stated Limit of Liability, the maximum amount this Company will pay for loss or damage from any one **OCCURRENCE\*,** and/or in the aggregate for combined Physical Damage loss from all **OCCURRENCES\***, in any one policy term shall not exceed the following amounts for loss caused by, resulting from, contributed to, or aggravated by the following perils, for all coverages combined, unless otherwise limited by the sublimits stated above:

***

**$10,000,000** by the peril of **FLOOD\*** -- Term Aggregate

***

**11. DEDUCTIBLES:**

From the amount of each claim for insured loss or damage arising out of any one occurrence, there shall be deducted the applicable amount shown below, and then the liability of this Company shall be only for the amount of such insured loss or damage in excess thereof, subject to the limit of liability, sublimits of liability or annual aggregate limits of liability set forth above:

> $100,000 as respects **LAND MOVEMENT\*.**
> 5% of the total insured values at risk at the time and place of loss subject to a $500,000 minimum deduction as respects as respects [sic] **FLOOD\***.
> 5% of the total insured values at risk at the time and place of loss subject to a $500,000 minimum deduction as respects the peril of **NAMED WINDSTORM\***.

3

$50,000 as respects **WATER DAMAGE*** other than **FLOOD***.
$25,000 as respects all other perils Physical Damage.

In the event that more than one deductible shown above or specified in any endorsement issued hereunder shall apply to insured physical loss or damage in any one Occurrence, only the largest shall be applied. Where an extension of coverage applies the base property damage deductible shall apply unless otherwise stated.

\*\*\*

**PROJECT EXTENSION ENDORSEMENT**

\*\*\*

Revised Total Insured Value: From $76,086,883 **to $86,086,883 = Additional $10,000,000**.[8]

The core of the dispute between the parties, as is relevant to the instant cross-motions for summary judgment, is the proper meaning of the phrase "total insured values at risk at the time and place of loss" when calculating the 5% deductible. Plaintiffs claim the terms of the Policy set both the minimum and maximum flood deductible at $500,000, or 5% of the $10,000,000 flood sublimit, arguing the "total insured values at risk" referred to in the Policy constitute not the total insured value of the Project, but rather the $10,000,000 flood sublimit.[9] On the other hand, Defendants assert the phrase "total insured values at risk" refers to the total value of the Project at the time and place of the loss, $68,869,506, and thus the deductible is properly calculated as 5% of that value, with a minimum of $500,000.[10] Accordingly, Defendants contend Plaintiff's claim for Flood Event damages is subject to a deductible of approximately $3,443,475. Plaintiffs and Defendants now each move this Court to enter summary judgment in their favor on the proper interpretation of the Policy's flood deductible.

---

[8] R. Docs. 305-2 & 828-3.
[9] R. Doc. 735.
[10] R. Docs. 337-1 & 828-1.

4

II.     APPLICABLE LAW

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[11] When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[12] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[13] The party seeking summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact.[14] "Once the movant does so, the burden shifts to the nonmovant to establish an issue of fact that warrants trial."[15]

"Under Louisiana law, an insured has a duty to read his insurance policy and know its provisions."[16] The words and phrases in an insurance policy are to be construed using their plain, ordinary, and generally prevailing meaning, unless the words have acquired a technical meaning, in which case the words must be ascribed their technical meaning.[17] Where the terms of an insurance policy render it ambiguous, "courts must construe the provision in a manner consistent with the 'nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.'"[18] Louisiana Civil Code article 2055 defines "usage" in the context of contractual interpretations as

---

[11] Fed. R. Civ. P. 56(a).
[12] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).
[13] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also, e.g., Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[14] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[15] *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 420 n.4 (5th Cir. 2016).
[16] *White v. Allstate Ins. Co.*, 513 F.Supp.2d 674, 682 (E.D. La. 2007) (citing *Motor Ins. Co. v. Bud's Boat Rental,* 917 F.2d 199, 205 (5th Cir. 1990)).
[17] *See* La. Civ. Code art. 2047.
[18] *Doerr v. Mobil Oil Corp.*, 774 So.2d 119, 124–25 (La. 2000) (quoting La. C.C. art. 2053).

"a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation."[19] Further, in the case of an ambiguous contract provision, Louisiana law directs courts to look to extrinsic evidence of the parties' intention at the time of contracting to resolve the ambiguity.[20] However, where the ambiguity cannot be resolved by extrinsic evidence, "the ambiguous contractual provision is to be construed against the insurer who furnished the policy's text and in favor of the insured finding coverage" except under certain circumstances.[21]

### III. DISCUSSION AND ANALYSIS

The initial issue before the Court on remand is whether the ambiguity the Fifth Circuit found in the Policy's flood deductible provision can be resolved based on extrinsic evidence submitted by the parties.[22] If the Court finds extrinsic evidence does not resolve the ambiguity, the Court must then determine whether Louisiana law requires a presumption in favor of coverage under these circumstances.[23]

#### A. Does Extrinsic Evidence Resolve the Policy's Ambiguity?

Extrinsic evidence of the parties' intention at the time of contracting is admissible to resolve a contractual ambiguity under Louisiana law.[24] Plaintiffs and Defendants have each

---

[19] La. C.C. art. 2055.
[20] *See Board of Supervisors of Louisiana State University v. 2226 Canal Street, LLC*, 262 So.3d 909, 914 (La. App. 4 Cir. 2018) ("[T]he use of extrinsic evidence is proper only where a contract is ambiguous after examination of the four corners of the agreement.") (citing *French Quarter Realty v. Gambel*, 921 So.2d 1025, 1030 (La. App. 4 Cir. 12/28/05).
[21] *Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 517 (5th Cir. 2010)
[22] *McDonnel Group*, 15 F.4th at 351.
[23] *Id.* Plaintiffs have taken the position that the presumption in favor of coverage issue should be primary in the Court's analysis. The argument is unpersuasive because the Fifth Circuit instructed this Court to evaluate the extrinsic evidence to determine whether the ambiguity issue can be resolved with the benefit of extrinsic evidence, and then to address the presumption of coverage issue "in the case of an ambiguity." Indeed, Plaintiffs' position is contrary to the logical order of operations given that the resolution of the ambiguity issue could alleviate the need to determine whether Plaintiffs enjoy a presumption of coverage. *See Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 961 n.16 (5th Cir. 2009) (noting that it is appropriate to first address the issue of contractual ambiguity through extrinsic evidence before determining whether the presumption in favor of coverage applies); *see also Miller v. Miller*, 1 So.3d 815, 819 (La. App. 2 Cir. 2009) (noting that the resolution of contractual ambiguity should precede any determination of whether the contract should be construed in favor of the non-drafting party).
[24] *See Bd. of Supervisors*, 262 So. 3d at 914.

submitted several documents they argue provide extrinsic evidence in support of their interpretations of the flood deductible provision.

As an initial matter, Plaintiffs argue this Court must refuse to consider any extrinsic evidence post-dating the issuance of the Policy.[25] Plaintiffs point to a footnote in the Fifth Circuit's opinion remanding this matter, in which that court noted "[t]he timing of the extrinsic evidence could be significant" because "[extrinsic] evidence should only be used to determine the intentions of the parties at the time the contract was made, not after the fact."[26] Plaintiffs argue thereby that the Court may consider extrinsic evidence only "from before or at the time of the inception of the policy[.]"[27] But the import of the Fifth Circuit's direction is that this Court may examine extrinsic evidence to determine *only* the intentions of the parties *at the time of contracting*; not that this Court may *not* examine extrinsic evidence which post-dates the issuance of the Policy. That is, in order for extrinsic evidence to resolve the ambiguity in the Policy, that extrinsic evidence must speak to the understandings and intentions of the parties at the time of contracting, not to what the parties may have believed at some point after the Policy had been bound. However, the extrinsic evidence itself need not be dated or have come into existence prior to contracting. For this reason, the Court will consider all proffered extrinsic evidence for evidence of the parties' understanding of the flood deductible provision at the time of contracting.

    1. **Plaintiffs' Extrinsic Evidence**

Plaintiffs submit the following extrinsic evidence in support of their position. On November 20, 2014, Starr sent a quote for builder's risk insurance, which included flood coverage,

---

[25] R. Doc. 873 at 17–18.
[26] *McDonnel Group*, 15 F.4th at 351 n. 16 (citing *Stewart Enters. v. RSUI Indem. Co.*, 614 F.3d 117, 124 (5th Cir. 2010)).
[27] R. Doc. 873 at 17.

to Plaintiffs' insurance brokerage firm, Arthur J. Gallagher ("AJG").[28] This quote provided a $10,000,000 sublimit for flood insurance and the following table for calculation of the deductible, which states the flood deductible is calculated as "5% VARTOL minimum $500,000" and defines "VARTOL" as "Values At Risk At Time Of Loss":[29]

**DEDUCTIBLES**

All deductibles listed below are per occurrence. Details of the deductibles are below.
*Note: VARTOL:* Values At Risk at Time Of Loss.

| Property | Value OR % VARTOL with $ Minimum | Comments |
|---|---|---|
| Physical loss or damage | $25,000 any one occurrence | Except below |
| **Property Damage Exceptions** | | |
| Named Windstorm | 5% VARTOL minimum $500,000 | |
| Earthquake | $25,000 | |
| Flood | 5% VARTOL minimum $500,000 | |
| Water Damage | $50,000 | Other than Flood |

The quote further provided for the application of deductibles as follows:[30]

**APPLICATION OF DEDUCTIBLES**

As respects real and personal property, all claims for loss, damage or expense arising out of any one occurrence shall be adjusted as one claim and from the amount of each such adjusted claim there shall be deducted the sum stated. If more than one stated dollar deductible applies to the same loss, as respects real and personal property, the largest stated deductible shall apply.

Deductibles for Property Damage and Time Element shall be applied separately.

The Starr quote calculated the Project's estimated total value upon completion, and thus its "Total Insurable Values[,]" at $80,000,000:[31]

| Values | |
|---|---|
| Category | US Dollars |
| Building Value Estimate | 70,000,000 |
| Parking Garage Estimate | 10,000,000 |
| Total Property: | $80,000,000 |

| Total Insurable Values (US Dollars) | |
|---|---|
| Total: | $80,000,000 |

---

[28] R. Doc. 737–2.
[29] *Id.* at 5.
[30] *Id.* at 6.
[31] *Id.* at 3.

Finally, the quote provided a total premium of $416,600, which it calculated based on a percentage of the Project's $80,000,000 Total Insurable Values:[32]

**VALUES, TERM RATES, AND PREMIUMS**

| | Property Premium | | | |
|---|---|---|---|---|
| Description | Values ($) | Term Rates $ / $100 | Premium | Comments |
| AOP | $80,000,000 | 0.1013 | $81,000 | |
| NWS | $80,000,000 | 0.3155 | $252,400 | |
| FLOOD | $80,000,000 | 0.1040 | $83,200 | |
| TOTALS | $80,000,000 | 0.5208 | $416,600 | |

On December 10, 2014, Plaintiffs' insurance broker, Edward Murphy of AJG, emailed the Starr quote to the owner of McDonnel, Mr. Allan McDonnel.[33] In this email, Murphy provided his own summary of the coverages and deductibles within the quote and stated the Policy "will include Flood coverage [in] the amount of $ 10M [and] will have a deductible of $ 500,000."[34] On February 11, 2015, Murphy sent a similar letter to Jung, again summarizing the Starr quote and "outlin[ing] the insurance coverage that will be ready to be put into place once the closing date has been established."[35] Therein, Murphy again stated a "[s]ublimit of $ 10,000,000 will apply to the peril of flood" and the flood deductible "will be $ 500,000."[36]

On February 23, 2015, Murphy formally provided quotes from both Lexington and Starr to Mr. McDonnel via letter, which identically provided for a $10,000,000 flood sublimit and listed the flood deductible as "5% VARTOL minimum $500,000."[37]

Plaintiffs argue that Murphy's summaries of the quotes, particularly his statements that flood coverage "will have a deductible of $ 500,000[,]" indicate that the intention of the parties

---

[32] *Id.* at 7.
[33] R. Doc. 737-3.
[34] *Id.*
[35] R. Doc. 737-4.
[36] *Id.*
[37] R. Doc. 828-6 at 14; 26.

9

was for the flood deductible to be $500,000. On the other hand, Defendants point out that Murphy's summaries directly contradict the quoted policy that Murphy was ostensibly summarizing, not just in respect to the amount of the flood deductible, but as to multiple other terms.[38] Thus, Defendants argue that Murphy's summaries are not reliable evidence of the intent of the parties.

### 2. Defendants' Extrinsic Evidence

Defendants submit the following extrinsic evidence in support of their position. On February 23, 2015, Lexington and Starr each issued formal policy binders to AJG, Plaintiffs' insurance broker, for review and approval of the Policy.[39] Both binders included the following relevant tables and provided that the flood deductible would be "5% VARTOL minimum $500,000":[40]

**DEDUCTIBLES:**

From the amount of each claim for insured loss or damage arising out of any one **OCCURRENCE\***, there shall be deducted the applicable amount shown below, and then the liability of the Company shall be only for the amount of such insured loss or damage in excess thereof, subject to the Limit of Liability, Sublimits of Liability and/or Aggregate Limits of Liability set forth above.

All deductibles listed below are per occurrence. Details of the deductibles are below.
*Note: VARTOL:* Values At Risk at Time Of Loss.

| Property | Value OR % VARTOL with $ Minimum | Comments |
|---|---|---|
| Physical loss or damage | $25,000 any one occurrence | Except below |
| **Property Damage Exceptions** | | |
| Named Windstorm | 5% VARTOL minimum $500,000 | |
| Earthquake | $25,000 | |
| Flood | 5% VARTOL minimum $500,000 | |
| Water Damage | $50,000 | Other than Flood |

**APPLICATION OF DEDUCTIBLES**

As respects real and personal property, all claims for loss, damage or expense arising out of any one occurrence shall be adjusted as one claim and from the amount of each such adjusted claim there shall be deducted the sum stated. If more than one stated dollar deductible applies to the same loss, as respects real and personal property, the largest stated deductible shall apply.

---

[38] For example, Murphy states in his summary that the Policy's earthquake deductible will be $50,000, R. Doc. 873-4, whereas the quote Murphy sent to Plaintiffs along with the summary clearly and explicitly lists the earthquake deductible as $25,000, R. Doc. 828-21 at 6.
[39] R. Docs. 828-8 (Lexington Binder) & 828-9 (Starr Binder).
[40] R. Docs. 828-8 at 7 & 828-9 at 6.

Deductibles for Property Damage and Time Element shall be applied separately.

**VALUES, TERM RATES, AND PREMIUMS**
Property Premium

| Description | Values ($) | Term Rates $ / $100 | Premium |
|---|---|---|---|
| AOP | $76,086,883 | 0.1065 | $81,000 |
| NWS | $76,086,883 | 0.3312 | $252,400 |
| FLOOD | $76,086,883 | 0.1093 | $83,200 |
| **TOTALS** | **$76,086,883** | **0.5467** | **$416,600** |

As reflected in the above table, the binders calculated the flood premium based on a percentage of the total value of the entire Project, $76,086,883.[41] Subsequently, on March 24, 2015, Mr. McDonnel signed the Client Authorization to Bind Coverage, which was returned to Defendants and coverage was bound.[42]

After the Flood Event, on October 25, 2017, Mr. McDonnel sent an email to Murphy requesting Murphy "push the insurance company to administer the flood policy correctly" with a $500,000 deductible and questioning how the "value at risk" could be calculated as more than the $10,000,000 policy limit.[43] In turn, Murphy sent an internal email to other AJG representatives on October 26, 2017, explaining, contrary to Plaintiffs' argument, that "[t]he industry interpretation and intent [of the Policy] is to have the [deductible] % apply to the amount of the contract cost that would be at risk[,]"[44] and stating Mr. McDonnel had had an alternate interpretation "planted in his head" by Joe Caldarera, Plaintiffs' expert witness.

However, Defendants also proffer an advisory issued by a disinterested insurer, Chubb (the "Chubb Advisory"), that Caldarera sent to Mr. McDonnel and others on August 18, 2017, after the Flood Event. The Chubb Advisory supports Defendants' position and states, in relevant part:

---

[41] R. Docs. 828-8 at 7 &. 828-9 at 8.
[42] R. Doc. 828-7.
[43] R. Doc. 828-10.
[44] *Id.* at 3.

11

> The way that the insurance policy in question responds to any type of damage depends on the policy wording. Where water damage (other than flood) is the cause of loss, policies typically provide coverage up to the policy limit, above the main working deductible. **Where flood is the cause of loss, the deductible is typically higher and, in some policies, may be expressed as a percentage of property value rather than a specified figure.** That percentage deductible is likely to be much higher than a flat deductible for water damage.
>
> **On a builders' risk insurance policy, the deductible may be based on the value of the project at the time of loss under a value-at-risk-at-time-of-loss (VARTOL) clause.** For example, if only the foundation is completed, the percentage deductible is based on the value of that portion of the project, which is much lower than for a completed building. For instance, on a value in place of $1 million, a 5 percent deductible is $50,000; for $10 million, it is $500,000. Where large percentage deductibles are part of the policy, policyholders may be able to obtain a separate deductible "buydown" policy.[45]

Defendants also submit a second memorandum from a disinterested insurer, CRCapital Advisors, LLC ("CRC" and the "CRC Memo"), in which CRC advised Jung following the Flood Event that the Policy's flood deductible would be calculated at 5% of the Total Insured Value of the Project, or approximately $3.8 million, and thus recovery under the Policy for the Flood Event, which the parties agree caused less than $3.8 million in damages, was "doubtful to unlikely[.]"[46]

Finally, Defendants point to the expert deposition testimony of Aaron Prefontaine, Defendants' independent loss adjuster, and Mark Pollack, Defendants' expert witness, taken during the course of discovery in this matter. Prefontaine testified that the meaning of "VARTOL" as used in the builder's risk insurance industry is "the value of the property and what has gone into it at the date of loss[;]" that is, that VARTOL refers to the value of the project as a whole at the time of the loss.[47] Additionally, Pollack testified that the calculation of a flood deductible based on a percentage of the total value of a project is consistent with the insurance industry's historical

---

[45] R. Doc. 828-1 at 16–17 (emphases added).
[46] R. Doc. 828-15
[47] R. Doc. 828-17 at 3.

application of the term VARTOL, even where, as here, the policy includes a flood coverage sublimit.[48]

Defendants assert the quotes and binders provided to Plaintiffs make clear that the flood deductible was to be calculated as 5% of the total value of the project at the time of the loss event, with $500,000 being only the minimum possible deductible. Further, Defendants argue the internal AJC communications following the Flood Event, the Chubb Advisory, the CRC Memo, and the deposition testimony of Prefontaine and Pollack make clear that the definition of VARTOL as understood in the insurance industry, is the value of the project as a whole at the time of the loss, and historical industry custom and practice is to calculate percentage-based deductibles according to VARTOL. On the other hand, Plaintiffs argue the policy binders alone cannot clarify the ambiguous flood deductible provision because they "merely contain the same policy language that the Fifth Circuit has already ruled is ambiguous[,]" and that the Court cannot consider Defendants' other extrinsic evidence as it post-dates the inception of the Policy.[49]

### 3. Review of Extrinsic Evidence

Based on its review of the extrinsic evidence presented by both parties, the Court finds that extrinsic evidence resolves the ambiguity in the Policy's flood deductible provision and establishes that Defendants' position is correct. It seems clear that the root of the present dispute can be traced to the error-ridden summaries of Defendants' policy quotes that Murphy of AJG authored and provided to Plaintiffs before coverage was bound. But given the inaccuracies in those summaries, as well as the fact that they were never communicated to Defendants, the Court cannot consider Murphy's summaries reliable evidence of the parties' intent. And "[u]nder Louisiana law,

---

[48] R. Doc. 828-18 at 4–5.
[49] R. Doc. 873 at 17.

an insured has a duty to read his insurance policy and know its provisions."[50] Plaintiffs' reliance on the incorrect summaries provided to them by their broker does not relieve them of this duty.

All quotes and binders provided by Defendants unequivocally state that the flood deductible will be calculated as "5% VARTOL minimum $500,000[.]" While that language standing alone could be considered ambiguous, Defendants have also established via their extrinsic evidence of internal AJC communications, the Chubb Advisory, the CRC Memo, that the widely understood and longstanding industry use of the term VARTOL, at and prior to the time of contracting, is to refer to the total value of the project at the time of the loss, without regard to any coverage sublimit.[51] Given the well-established definition of this term, as well as the lack of any reliable extrinsic evidence in support of Plaintiffs' position and Plaintiffs' duty, independent of their insurance broker, to read their policy and know its provisions, the Court holds that Defendants are correct: the Policy's applicable deductible for Plaintiffs' Flood Event claim, calculated as 5% of the value of the Project at the time of the Flood Event, with a minimum of $500,000, is $3,443,475.[52] Accordingly, the Court concludes there are no genuine disputes of material fact as to this issue, and Defendants are entitled to partial summary judgment in their favor as a matter of law.

---

[50] *White v. Allstate Ins. Co.,* 513 F.Supp.2d 674, 682 (E.D. La. 2007) (citing *Motor Ins. Co. v. Bud's Boat Rental,* 917 F.2d 199, 205 (5th Cir. 1990)).

[51] The Court has already rejected Plaintiffs' argument that the Court cannot consider Defendants' industry custom evidence because it post-dates the Flood Event. *See supra* Section III.A.

[52] Having resolved the Policy's ambiguity, the Court need not determine whether Louisiana law requires a presumption of coverage in favor of the insured under these circumstances. However, the Court notes "a presumption in favor of coverage does not apply where the insured is a sophisticated commercial entity that itself drafts or utilizes its agents to secure desired policy positions." *McDonnel*, 15 F.4th at 351 (citing *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 958 (5th Cir. 2009)). Here, McDonnel is a sophisticated general contractor directing an $86 million hotel renovation, and it hired an equally sophisticated insurance broker, AJG, to assist in procuring insurance suitable for the Project. The record also demonstrates that McDonnel and AJG were active in reviewing and discussing terms, proposing alternatives, and even calculating proposed premiums. On this evidence, were it required to reach the issue, the Court would hold that McDonnel is a sophisticated commercial entity such that the presumption against the drafter and in favor of coverage does not apply.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment, R. Doc. 828, is **GRANTED** and Plaintiffs' Motion for Partial Summary Judgment, R. Doc. 768, is **DENIED**.

New Orleans, Louisiana, this 13th day of September, 2023.

                                          **GREG GERARD GUIDRY**
                                          **UNITED STATES DISTRICT JUDGE**