UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MCDONNEL GROUP, LLC<br>     *Plaintiff* | * CIVIL ACTION<br>*<br>* NUMBER:  18-1380 |
| VERSUS | * C/W 19-2230, 19-2227, 19-10462<br>* |
| STARR SURPLUS LINES INSURANCE COMPANY<br>     *Defendant* | * SECTION: "T" (1)<br>*<br>* JUDGE GREG GERARD GUIDRY<br>* |
| *Ref. Case No. 18-1380* | * MAGISTRATE JUDGE<br>  JANIS VAN MEERVELD |

ORDER AND REASONS

Before the Court is plaintiff The McDonnel Group, LLC's Motion to Compel Discovery Production (Rec. Doc. 1028) from defendants Starr Surplus Lines Insurance Company and Lexington Insurance Company (the "Insurers"). At issue is a settlement agreement between the Insurers and a former co-defendant. The Court finds the settlement agreement is relevant and that production is proportional with the needs of the case. Accordingly, the Motion to Compel (Rec. Doc. 1028) is GRANTED; the Insurers shall produce the settlement agreement, provided that they may designate it confidential and limit its disclosure outside of this litigation.

Background

This lawsuit arises out of a series of water intrusion events at The Jung Hotel (the "Hotel") in 2017 (March 10, April 21, June 29, July 22, and August 5). At the time, the Hotel was being renovated by The McDonnel Group ("McDonnel") pursuant to an agreement with Jung, the owner of the Hotel. McDonnel was insured by the defendant Insurers through Completed Value Construction All Risks Policies ("Policies"), which covered property damage. McDonnel claims property damage and repair costs as well as costs for delays to the renovation project and/or to expedite work on the project.

1

McDonnel filed this lawsuit for declaratory relief and monetary damages. Later, Mechanical Construction Company LLC as agent for BMCC, All Star Electric Inc. ("All Star"),[1] and Jung filed lawsuits against the Insurers, each claiming that it is an additional insured under the Policies. Those lawsuits were consolidated with the present one. In addition to its separate lawsuit, Jung, LLC has intervened in the lead action.

Among other things, the Insurers allege fraud in their affirmative defenses to McDonnel's claims. They allege that McDonnel made fraudulent misrepresentations and/or omissions regarding its contract fees, damaged equipment, and repair costs, including two invoices for the work of Bernhard MCC, LLC ("BMCC") for the March 10 and July 22 events that purportedly overstate hours spent on the job or billed for work which was not water damage repair. See Rec. Doc. 442, at 4. The Insurers allege that they paid these invoices plus overhead at 6% and contingency at 8%. Id.

Of relevance to the present motion to compel, the Insurers contend that BMCC withdrew its claims for repair costs related to the March, April, and July loss events as of January 16, 2020. They cite BMCC's Initial Disclosures, in which it strikes through the cited invoices and states "previously claimed, but subsequently paid in full." Rec. Doc. 1030-1, at 2. These invoices are listed under the heading "Direct Costs" from Builders-Risk Occurrences. Id. This section still lists unpaid invoices related to the August 5, 2017, flood event totaling approximately $150,000. Id.

BMCC's Initial Disclosures also list a separate heading for "Extended Conditions Costs" (i.e. extra costs incurred while repairs were completed) of about $736,000. Id. at 3. BMCC adds that it "has become aware that some of the 'direct cost' claims included estimated extended-field-management costs that are accounted for in [BMCC's expert's] extended-general-conditions

---

[1] BMCC and All Star were hired as subcontractors on the Project by McDonnel.

calculations and claim amount." Id. BMCC acknowledges that "[t]hree of those 'direct cost' claims were adjusted, accepted by insurers, and paid, including the March 10, April 21, and July 22, 2017, event-based claims." Id. BMCC then stated it was "reducing the amount of its overall extended-general-conditions claim by the extended-field-management amounts that have been paid." Id. It then lists these amounts, which include amounts for the March and July events (though less than the amounts stricken through in the Direct Costs section). Id. But it appears this did not extinguish all of BMCC's claims related to the March and July events. Indeed, the Initial Disclosures conclude with the following summary:

> BMCC's claims in this litigation are:
> i.   Claim for the August 5, 2017, occurrence:                                    $150,127.20
> ii.  Claim for Extended General Conditions (due to the
>      March 21 [sic], April 21, July 22, and August 5 events):                     $736,261.25
> iii. Total:                                                                        $886,388.45

Id. at 4.

Sometime after BMCC issued its Initial Disclosures, it reached a settlement with the Insurers. And in February 2022, the district court dismissed "all claims brought by BMCC and/or that could have been brought by BMCC" against the Insurers in these consolidated actions. Rec. Doc. 730.

McDonnel now seeks production of the settlement agreement between the Insurers and BMCC. It contends that any agreements between the Insurers and BMCC related to the BMCC invoices for the March 10 and July 22 events are relevant to the Insurers' fraud defense. They also insist they have a right to such settlement agreement(s) to the extent they "include cooperation agreements, statements from witnesses, admissions of fact, stipulations, or other such factually relevant provisions." Rec. Doc. 1028-2, at 6.

3

The Insurers respond that the settlement agreement cannot be relevant because BMCC had already withdrawn its claims related to invoices for the March 10 and July 22 events before the parties settled. Thus, they explain, the 2022 settlement agreement is irrelevant to those allegedly fraudulent invoices. Further, they argue that the fraud-based defenses relate to McDonnel's submission of the invoices to the Insurers (allegedly with intent and knowledge). They seem to argue that their defenses do not relate to any purported fraud or misrepresentations by BMCC— even if McDonnel were to claim that BMCC did something wrong instead of McDonnel.

Additionally, the Insurers insist there is no basis to believe that the settlement agreement may contain cooperation agreements, witness statements, admissions, or stipulations. Finally and in the alternative, the Insurers submit that if the Court orders production of the settlement agreement, the amount of settlement should be redacted as entirely irrelevant.

McDonnel responds that the settlement agreement remains relevant. It points out that the Initial Disclosures show that BMCC was still seeking damages for extended conditions concerning the March and July events. Thus, they argue, the Insurers cannot show that BMCC and the Insurers had already resolved all issues related to the March and July invoices long before they settled. McDonnel insists that the settlement agreement bears on the Insurers' claims of fraud related to the submission of BMCC's July invoice. It submits that relevance at the discovery stage is a low bar and argues that information is discoverable as long as it bears on or reasonably could lead to other matters that could bear on any issue that is or may be in the case. It argues the following parts of the settlement agreement are relevant: (1) specific release language because of the possibility of a global release, (2) possibility of factual recitals and admissions or denials, and (3) possibility of cooperation clauses. McDonnel adds that the Insurers would not suffer any strain on resources to produce the settlement agreement.

Law and Analysis

1. *Scope of Discovery*

The Federal Rules of Civil Procedure provide that "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. Proc. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." Id. The Rule requires consideration of the following factors in assessing proportionality: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Id.

As with any other document sought in discovery, "[d]iscovery of a settlement agreement is only appropriate if it is relevant to the instant litigation." Moore v. Wayne Smith Trucking Inc., No. CIV.A. 14-1919, 2015 WL 6438913, at *3 (E.D. La. Oct. 22, 2015). For example, courts have ordered production of a plaintiff's settlement agreements with a former co-defendant where the remaining defendant might be entitled to offset. Childers v. Rent-A-Ctr. E., Inc., 749 F. Supp. 3d 693, 696–97 (E.D. La. 2024); Gulf S. Lithotripsy, LLC v. N. River Ins. Co., No. CV 06-9613, 2008 WL 11353646, at *2 (E.D. La. Feb. 6, 2008); see Lundy Enters., LLC v. Indus. Risk Insurers, No. CIV.A. 06-3509, 2009 WL 2764703, at *2 (E.D. La. Aug. 28, 2009) (finding the settlement agreement between plaintiffs and a former defendant was not discoverable because given the claims plead, the remaining defendant could not be entitled to setoff as a result of the settlement ). And in Gremillion v. Grayco Communications, L.P., this Court ordered production of a confidential settlement agreement by the defendant with plaintiffs in a different lawsuit that had asserted similar Fair Labor Standards Act claims where the defendant's payment practices had

changed following that settlement. No. CV 16-9849, 2017 WL 6623886, at *4–5 (E.D. La. Dec. 28, 2017). Defendant was allowed to redact settlement amounts, provisions related to attorney's fees, and personal identifying information of the plaintiffs. Id.

   *2. Analysis*

The case law makes clear that relevance of a settlement agreement must be determined on a case by case basis. The Court finds that the settlement agreement between the Insurers and BMCC is relevant here.

First, the Court is not convinced that BMCC had released all claims related to the March and July invoices long before the settlement, as the Insurers contend. According to the Initial Disclosures, BMCC continued to claim extended-conditions costs related to the March and July events. See Initial Discl., Rec. Doc. 1030-1, at 3. These costs may include those that the Insurers allege were fraudulently claimed by McDonnel. Further, even if March and July invoices described by BMCC in its Initial Disclosures as "paid in full" are the only ones that Insurers allege McDonnel submitted fraudulently, without a stipulation in the record, claims related to these invoices remain part of the "claims brought by BMCC and/or that could have been brought by BMCC" against the Insurers that were dismissed following the parties' settlement.

Critically, regardless of which of BMCC's claims were live at the time of settlement, the settlement agreement may contain relevant information. BMCC's claims concerning amounts due were so closely related to McDonnel's claims that the former's lawsuit was consolidated with the latter. The defendant Insurers claim that McDonnel fraudulently submitted some of BMCC's invoices to the Insurers for payment. It is entirely possible that the settlement between BMCC and the Insurers contained a cooperation clause related to the BMCC invoices. It is possible that the Insurers released potential claims for fraud that it could have asserted against BMCC. The

settlement agreement may contain factual recitals or admissions that bear on the validity of the March and July BMCC invoices. The amount of settlement may reflect whether Insurers considered BMCC's invoices accurate (as opposed to fraudulent).

The Insurers argue that the issue in this case is McDonnel's fraud and not any misdeeds by BMCC. While this may be the crux of the Insurers' defense, the Court finds that it does not make the settlement agreement any less relevant. For example, if the Insurers admitted in the settlement agreement that all BMCC invoices were accurate, this would undermine their argument that McDonnel had engaged in fraud by submitting false BMCC invoices. For the reasons above, the Court finds the settlement agreement between BMCC and the Insurers is relevant.

Not only is the settlement agreement relevant, but its production is proportional with the needs of the case. The Insurers have not cited any burden associated with production and the Court cannot identify any. As for commercial and privacy concerns, the Insurers do not identify any with specificity. In fact, they do not even claim that the agreement is subject to a confidentiality clause. At most, they ask that the "confidentiality of the agreement" be protected by a protective order (and that settlement amounts be redacted). As noted above, the settlement amounts may be relevant. Thus, redaction will not be allowed. However, to the extent the Insurers have legitimate commercial or privacy concerns with public disclosure of the settlement agreement, the Court will allow production of the settlement agreement pursuant to a protective order as described below.

## Conclusion

Having found the settlement agreement between the Insurers and BMCC relevant and proportional to the needs of the case, McDonnel's Motion to Compel (Rec. Doc. 1028) is GRANTED. The Insurers shall produce the settlement agreement, provided that they may designate the settlement agreement as confidential and subject to this protective order. To do so,

they shall clearly mark it "confidential." Such marked settlement agreement shall be used only for purposes of this litigation and must not be disclosed to anyone, except employees of parties to this litigation, court personnel, the parties' counsel of record, experts retained in connection with this litigation, and testifying witnesses during depositions, trials or evidentiary hearings in open court. Except for court personnel, parties, and counsel, all persons to whom the settlement agreement is disclosed must sign an affidavit that must be maintained by the disclosing party, agreeing to the terms of the protective order and submitting to the jurisdiction of this court for enforcement of those terms. To the extent any party seeks to use the marked agreement at trial or motion practice, it is not automatically entitled to be sealed. The filing party shall seek to seal the document in accordance with Local Rule 5.6.

New Orleans, Louisiana, this 17th day of September, 2025.

                                           _____
                                                       Janis van Meerveld
                                                    United States Magistrate Judge